IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA )
                          )
     v.                   )     1:09cr346-1
                          )
MICHAEL UYIOGHOSA OHANGBON )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge

This matter is before the court on the motion of the Defendant, Michael Uyioghosa Ohangbon ("Ohangbon"), to suppress the search of his vehicle and residence. (Doc. 11.) The Government filed a response. (Doc. 12.) On February 4, 2010, an evidentiary hearing was held during which the Government presented the testimony of Davidson County Sheriff's Office ("DCSO") Detectives Brian Saintsing ("Saintsing") and Michael R. Burns ("Burns"). Detective Saintsing has worked for the DCSO for five years. Detective Burns is a 13-year veteran, with 11 years of service with the Lexington (North Carolina) Police Department, and has been with the vice and narcotics unit of the DCSO since January 2007. Following the hearing and upon the court's request, the parties submitted further briefing on the grounds for the traffic stop, including any alleged traffic violations. (Doc. 17, 18.)

## I.  BACKGROUND

Having carefully considered the evidence, the court finds the following facts:

On June 8, 2009, Saintsing was parked in a marked DCSO patrol car on the median of U.S. Highway 52 near mile marker 100, just south of Winston-Salem, North Carolina, conducting patrol.  Saintsing was aware that, beginning approximately three days earlier, the DCSO had begun surveillance of Ohangbon based on a tip that he was trafficking in marijuana, and Saintsing was a member of the DCSO surveillance team.[1]  During his patrol, Saintsing observed a purple/blue Mercedes automobile, which he suspected was driven by Ohangbon, pass him on U.S. Highway 52, and Saintsing entered the roadway to follow it.

---

[1] According to the affidavit supporting the search warrant application for the home Ohangbon frequented, Saintsing and Burns had met with a confidential informant ("CI") on June 5, 2009, who indicated that a man known as "Mike" was selling marijuana in the Davidson County, N.C., area. (Government Ex. 3.)  The CI stated that he had purchased marijuana from Mike on several occasions in the past and that Mike usually delivered marijuana in Davidson County 2 or 3 times per week. (Id.)  Mike was identified as a "clean cut black male approximately 40 years of age" who drove a "purple in color" Mercedes and spoke with a foreign accent. (Id.)  On June 6, 2009, Saintsing and Burns located "a purple in color Mercedes" in the Lexington, N.C., area driven by a "clean cut black male"; they determined its owner to be Ms. Ifeyinwa Uwoghiren and surveilled it as it stopped several times for short periods, including one area known as a marijuana distribution area. (Id.)  Surveillance continued on June 8, 2009, by detectives of the Forsyth County (N.C.) Sheriff's Office, who followed the Mercedes from the residence at 305 Royal Grey Court in Winston-Salem as Ohangbon left with the vehicle. (Id.)  Surveillance was relinquished to the DCSO as the vehicle crossed the Davidson County line immediately before Saintsing's stop at issue. (Id.)

2

Saintsing followed the vehicle for approximately three to three and one-half miles. At some point from the time he became aware of the Mercedes, he observed it travel from the far left (passing) lane through the right lane and over the white line about two feet onto the shoulder rumble strips that alert a driver he has driven off the highway. He then observed the Mercedes return to the right lane where it traveled back and forth within the lane, touching the far right white line several times. Saintsing also observed that the month decal on the upper left hand corner of the North Carolina license plate was faded and could not be deciphered.[2]

Saintsing engaged his lights and pulled the Mercedes to the roadside near mile marker 97. He talked with Ohangbon at the passenger side window and obtained his license, telling him that the vehicle was being stopped because the month sticker on the license plate was not visible and to check on him because of the erratic lane changes resulting in his running off the shoulder of the roadway. As he was doing this, Saintsing noticed that Ohangbon was sweating, moving nervously back and forth in his seat, and would not make eye contact. Saintsing also detected an odor coming from the vehicle which, based on his training and

---

[2] A photograph of the vehicle showing the faded license plate sticker was admitted as Government Exhibit 1.

experience handling over 500 cases involving marijuana, he determined to be marijuana.

Ohangbon was directed to exit the vehicle and wait in the patrol car while his registration plate and driver's license were being checked. While conducting these checks, Saintsing engaged Ohangbon in general conversation, asking him where he was headed. Ohangbon stated that he was coming from North Carolina A&T University in Greensboro, North Carolina, headed to Lexington, North Carolina, to visit his grandmother. Saintsing found this suspicious because Ohangbon's route of travel was inconsistent with what he believed to have been the most direct route.

The records check took about five minutes, and the driver's license and registration "came up clear." Saintsing issued Ohangbon a warning citation for "unsafe movement" and near the box marked "other" noted an invalid/illegible license sticker.[3] Saintsing advised Ohangbon that while at Ohangbon's passenger window he (Saintsing) had smelled marijuana around the vehicle and intended to walk a canine around his car. Ohangbon said that he had "no problem" with his doing so. Saintsing called Det. Jones for backup because DCSO policy requires the presence of two officers when a canine sniff is conducted.

---

[3] Saintsing testified that a sticker in the upper left hand corner of the license plate indicates a number corresponding with the month the plate is to be renewed.

4

Within approximately five minutes, Jones arrived. Saintsing, who is trained in the handling of canines and has used his dog, "Radar," in approximately 200 drug searches, put the dog on a lead and started at the left front of the vehicle. At the rear driver's side door Radar alerted to the presence of narcotics. Saintsing advised Ohangbon that the dog had alerted to narcotics and that the vehicle would be searched.

Saintsing searched the vehicle and found one ounce of marijuana in the pocket of a jacket resting on the rear seat. In the trunk he located a cooler with in excess of 20 bags of marijuana, as well as more marijuana in a plastic bag.[4] Ohangbon was placed under arrest for marijuana possession and advised of his Miranda rights. Ohangbon requested an attorney, and thus no further questions were asked.

Ohangbon was transported to the DCSO headquarters. There, Saintsing observed Ohangbon tell Det. Jones that he wished to speak about assisting with his charges. Jones re-read Ohangbon his Miranda rights using the DCSO's form, and Ohangbon stated that he wished to waive his rights so he could speak. Ohangbon stated, among other things, that the marijuana in the car was his and that he was selling it to pay college fees.

---

[4] The application for the search warrant of the residence indicates a total of two pounds eight and one-half ounces of marijuana were seized from the Mercedes. (Government Ex. 3.)

5

Based on the marijuana found as a result of the traffic stop, Burns, along with Detective F.G. Gregory-Phillips of the Forsyth County Sheriff's Office, made an application for a warrant at approximately 9:00 p.m. that evening to search, among other places, the residence from which Ohangbon had left earlier that day. When the search warrant was issued, Burns assisted in the search. In a bedroom closet, Burns smelled the odor of marijuana and located marijuana in a suitcase. In the garage, a bag of marijuana and a handgun were found.

Ohangbon was charged with possession with intent to distribute marijuana pursuant to 21 U.S.C. § 841(a)(1), maintaining a drug-involved premises pursuant to 21 U.S.C. § 856(a)(1), possession of a firearm by a convicted felon pursuant to 18 U.S.C. § 922(g)(1), and possession of a firearm by an illegal alien pursuant to 18 U.S.C. § 922(g)(5). Ohangbon moves to suppress the marijuana found in his vehicle on the grounds that Saintsing lacked a lawful basis to stop and search the Mercedes on U.S. Highway 52. Ohangbon moves to suppress the marijuana and handgun found in the residence based solely on the grounds that, if the search of the vehicle is invalid, the evidence from the search of the home is invalid as "fruit of the poisonous tree."

**II. ANALYSIS**

   **A. Vehicle Search**

There is no question but that a roadside traffic stop is a seizure within the meaning of the Fourth Amendment. Under <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), and as set forth in, among other places, <u>United States v. Rusher</u>, 966 F.2d 868 (4th Cir. 1992), the court must determine whether the officer's action was justified at its inception and, if so, whether his action thereafter was reasonably related to the scope of the circumstances which justified the initial interference. Therefore, if the initial traffic stop was illegal or the officers exceeded the stop's proper scope, the seized contraband is excluded under the "fruit of the poisonous tree" doctrine. <u>Id.</u> at 875 (citing <u>Wong Sun v. United States</u>, 371 U.S. 471, 484 (1963)).

As to the first question -- whether the stop was justified at its inception, a law enforcement officer must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts," reasonably warrant the particular intrusion. <u>Terry</u>, 392 U.S. at 21. "[W]hen an officer observes a traffic offense or other unlawful conduct, he or she is justified in stopping the vehicle under the Fourth Amendment." <u>United States v. Hassan El</u>, 5 F.3d 726, 730 (4th Cir. 1993); <u>see</u> <u>Whren v. United States</u>, 517 U.S. 806, 810

7

(1996). A stop may be pretextual; that is, the officer may have another motive for stopping the vehicle. The court applies an objective test, and "if an officer has probable cause or a reasonable suspicion to stop a vehicle, there is no intrusion upon the Fourth Amendment. That is so regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity." Hassan El, 5 F.3d at 730.

   **1.   Initial Stop**

Detective Saintsing testified that he observed Ohangbon's vehicle travel from the far left lane to beyond the white line of the right lane, onto the rumble strips of the shoulder about two feet off the roadway, back into the right lane, and then back and forth within the right lane of travel while touching the far white line several times. Saintsing also observed an illegible registration decal on the license plate. He testified that he stopped the vehicle because of both the erratic driving and illegible registration decal.

The Government contends that Ohangbon's lane change constituted a violation of North Carolina General Statute § 20-146(d)(1), relying upon State v. Baublitz, 172 N.C. App. 801, 616 S.E.2d 615 (2005) (holding that reasonable suspicion existed to stop a vehicle that twice crossed the centerline of the

highway in violation of N.C. Gen. Stat. § 20-146(a)).[5]  Under section 20-146(d)(1), when a street has been divided into two or more lanes of traffic, "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."  N.C. Gen. Stat. § 20-146(d)(1).  This provision is applicable to the portion of four-lane highway where Saintsing stopped Ohangbon.  The conduct Saintsing observed -- Ohangbon switching lanes, driving off the side of the road, re-entering the roadway, and swaying within his lane of travel -- provided reasonable suspicion that the driver could not safely perform the movement of changing lanes.  Cf. State v. Davis, 68 N.C. App. 238, 240, 314 S.E.2d 828, 830 (1984) (upholding conviction for failing to stop for light and siren when officers stopped defendant for "erratic driving pattern").

---

[5] N.C. Gen. Stat. § 20-146(a) provided in relevant part: "(a) Upon all highways of sufficient width a vehicle shall be driven upon the right half of the highway except as follows: (1) When overtaking and passing another vehicle proceeding in the same direction under the rules governing such movement; (2) When an obstruction exists making it necessary to drive to the left of the center of the highway; provided, any person so doing shall yield the right-of-way to all vehicles traveling in the proper direction upon the unobstructed portion of the highway within such distance as to constitute an immediate hazard; (3) Upon a highway divided into three marked lanes for traffic under the rules applicable thereon; or (4) Upon a highway designated and signposted for one-way traffic."

Ohangbon argues that section 20-146, particularly when read in conjunction with N.C. Gen. Stat. § 20-154(a),[6] requires that the challenged movement "potentially endangered another." (Doc. 18 at 3.) Section 20-154(a) provides in relevant part:

> The driver of any vehicle upon a highway or public vehicular area before starting, stopping or turning from a direct line shall first see that such movement can be made in safety, and if any pedestrian may be affected by such movement shall give a clearly audible signal by sounding the horn, and whenever the operation of any other vehicle may be affected by such movement, shall give a signal as required in this section, plainly visible to the driver of such other vehicle, of the intention to make such movement.

N.C. Gen. Stat. § 20-154(a). Ohangbon argues that in order to stop him there must have been evidence that another vehicle was nearby that would have been affected by his movement, which he argues was not demonstrated in this case. Under this line of reasoning, an officer observing a vehicle swerving on an otherwise empty highway (or away from other vehicles at the time) could not then stop a driver who is driving erratically; such a driver could be under the influence of alcohol or drugs or otherwise incapacitated or infirm. The court declines to adopt this strained interpretation.

Ohangbon argues next that Saintsing gave inconsistent testimony during cross-examination regarding the timing of Ohangbon's lane changes and the observation of the faded license

---

[6] It is worth noting that the Government does not rely on N.C. Gen. Stat. § 20-154(a).

decal.  He contends that, as a consequence, Saintsing's credibility was undermined such that the court should reject his testimony completely.

In his direct testimony, Saintsing stated that he pursued Ohangbon's Mercedes for approximately three to three and one-half miles before he observed the violations.[7]  During cross-examination, he elaborated by stating that the Mercedes was in the left lane when it passed Saintsing, but that "not long after" Saintsing entered the highway from the median he observed Ohangbon make the lane changes and run onto the shoulder about two feet past the white line before returning to the roadway. As Saintsing followed the vehicle, he stated, he observed it sway within the right lane, touching the white line several times.  In further cross-examination, Saintsing testified that he could not recall whether he pulled out of his stationary position because of Ohangbon's lane change but recalled noticing the faded license decal before pulling out.  Ohangbon argues that it is simply not credible to believe that Saintsing could have noticed the faded license plate decal when Ohangbon passed Saintsing's parked patrol car at 60 to 65 m.p.h. and that Saintsing's inability to recall precisely the timing of the lane changes is fatal to his credibility.

---

[7] "Q: About how long did you follow Mr. Ohangbon before you noticed the violations that you referred to?  A:  Approximately three miles, three and a half miles."

11

In the court's view, any discrepancies in Saintsing's testimony do not undermine his credibility to the point of causing the court to reject it all. Based on the totality of the circumstances, the court finds Saintsing credible regarding the critical fact that he observed the Mercedes change lanes erratically, run off the road, and swerve within a lane during its travel down the highway.

Ohangbon suggests finally that his conduct was consistent with that of a driver who was trying to pull his car over to allow an approaching law enforcement vehicle to pass. North Carolina law requires that, once a law enforcement vehicle activates its lights and siren, a driver must position his vehicle "as near as possible and parallel to the right-hand edge or curb . . . unless directed otherwise by a law enforcement or traffic officer." N.C. Gen. Stat. § 20-157(a). In other words, a driver should pull closest to the right side of the roadway but not off the road, unless directed to do so. The problem for Ohangbon is that there was no testimony that his movements occurred after Saintsing had activated any siren or lights, and the court finds it is unlikely that they did. Nor was there any testimony that Saintsing had done anything to direct Ohangbon to pull over when Ohangbon swerved off the roadway onto the shoulder and then back onto the road. Thus, while aspects of Ohangbon's conduct might be consistent with that of a driver

12

accommodating an approaching law enforcement vehicle (e.g., a lane change and travel near the right white line), in the absence of the statutory prerequisites of the use the patrol car's lights and siren and a directive to pull over, it does not vitiate Saintsing's reasonable suspicion based upon objective observations that the driver was making unsafe movements.

It is true that every indication suggests this was a pretextual stop, as Saintsing and the DCSO vice and narcotics unit was surveilling Ohangbon for suspected drug-trafficking activities. But an officer's subjective motivation does not invalidate the stop where there is reasonable suspicion of a traffic violation.[8] Whren, 517 U.S. at 813. Thus, the court concludes that Saintsing had a reasonable suspicion of a traffic violation such that the stop of Ohangbon's vehicle was not unconstitutional.[9]

---

[8] To the extent Ohangbon relies on Saintsing's characterization of the stop as a general "welfare stop," the court rejects any notion that such would justify the stop in this case absent reasonable suspicion based on articulable facts indicating a traffic offense or other violation of law, as found here.

[9] The Government argues that Saintsing's observation of a faded month sticker on the license plate constitutes reasonable suspicion that Ohangbon was operating the vehicle without the proper registration plate, citing N.C. Gen. Stat. §§ 20-111(1) & (2) and N.C. Gen. Stat. § 20-63(b). The former sections make it unlawful to "willfully display an expired license or registration plate on a vehicle knowing the same to be expired," whereas the latter section requires that "[e]very license plate shall have displayed upon it the registration number assigned to the vehicle for which it is issued, the name of the State of North Carolina, which may be abbreviated, and the year number for which it is issued or the date of expiration." See State v. Harrell, 96 N.C. App. 426, 386 S.E.2d 103 (1989) (affirming jury verdict for

13

**2. Duration**

The next question is whether, once the car was stopped, the duration or nature of the stop exceeded the proper scope permitted by the Fourth Amendment. As the court noted in Rusher, during a routine traffic stop an officer may request a driver's license and vehicle registration, run a computer check, and issue a citation. 966 F.2d at 876. Ordinarily, once those items have been completed, the driver must be allowed to proceed on his way without further delay by the police. Any further detention beyond the scope of the Terry stop is, therefore, illegal unless the officer has a reasonable suspicion of other criminal activity or the person consents to the detention.

In this case, Saintsing smelled marijuana at the time he first approached Ohangbon's Mercedes. This provided probable cause to search the vehicle.[10] United States v. Scheetz, 293 F.3d 175, 183-84 (4th Cir. 2002). Consequently, Saintsing was free to search the entirety of the vehicle without a warrant

---

expired plate); cf. State v. Chitwood, 673 S.E.2d 167 (2009) (unpublished) (finding lack of license plate provided probable cause for violation of N.C. Gen. Stat. § 20-111). Ohangbon argues that his conduct does not fall within these statutes because there is no evidence he acted intentionally. Because the court finds that the unsafe movement provided a legitimate basis for the traffic stop, this alleged basis becomes superfluous and need not be reached.

[10] Saintsing also noted Ohangbon's excessive nervousness and refusal to make eye contact, which have been recognized as additional support for the conclusion that reasonable, articulable suspicion that criminal activity is afoot. United States v. Branch, 537 F.3d 328, 338 (4th Cir. 2008), cert. denied, 129 S. Ct. 943 (2009).

14

because probable cause existed through a belief it contained contraband.  Maryland v. Dyson, 527 U.S. 465, 467 (1999). Moreover, before the search was conducted, Saintsing also conducted a canine sniff.  A canine sniff is not a search within the meaning of the Fourth Amendment.  Branch, 537 F.3d at 335-36.  Because of the presence of the marijuana odor, Saintsing was justified in extending the stop for the canine sniff.  See id. at 338-39.  Once the dog alerted to the presence of illegal narcotics, an additional, independent basis for probable cause existed to search the vehicle.  United States v. Jeffus, 22 F.3d 554, 557 (4th Cir. 1994).

Ohangbon contends that he never consented to the search of the Mercedes.  (Doc. 11 at 3.)  Because the court finds that Saintsing had probable cause to search the vehicle based on his observation of the odor of marijuana through the passenger window as well as based upon the dog's having alerted to the presence of illegal narcotics, the Defendant's consent was not required.

**B.  Residence Search**

Ohangbon's challenge to the search of the residence is based solely on the contention that the traffic stop and search, which served as the sole basis for providing probable cause for the search warrant, were unconstitutional.  Because the court has found that the traffic stop and search were not conducted in

15

violation of the Fourth Amendment, the sole basis for challenge of the search warrant no longer remains.  Boggs v. Bair, 892 F.2d 1193, 1200 (4th Cir. 1989) (holding that defendant's fruit of the poisonous tree argument failed because the search of his car was lawful).

### III. CONCLUSION

The court has carefully considered the arguments raised by the parties.  For the reasons set forth above,

IT IS ORDERED that the Defendant's Motion to Suppress (Doc. 11) is DENIED.

  /s/   Thomas D. Schroeder
United States District Judge

February 22, 2010